UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAWARIMEDIA LLC, *et al.*,

      Plaintiffs,

v.

GRETCHEN WHITMER*, et al.*,

      Defendants.

Case No. 20-cv-11246
Hon. Matthew F. Leitman

_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 2)

Under Michigan law, citizens who sought to have an initiative proposal placed on the 2020 general election ballot were required to collect more than 340,000 signatures by May 27, 2020. Likewise, Michigan law required certain candidates for Congress who wished to appear on the 2020 primary ballot to obtain 1,000 signatures by April 21, 2020. Against the backdrop of these ballot-access requirements, and in order to combat the COVID-19 pandemic, on March 23, 2020, Defendant Governor Gretchen Whitmer began issuing executive orders that required Michigan residents to stay at home except in very limited circumstances. Those orders remained in effect for more than two months. Notwithstanding the Governor's orders, the State of Michigan continued to strictly enforce its ballot-access signature requirements and filing deadlines against candidates and citizens wishing to place initiatives on the ballot. As

1

a result, some candidates and initiatives that likely would have qualified for the ballot were excluded from the ballot.

A candidate for Congress recently filed suit alleging that the combination of Governor Whitmer's executive orders and the State's strict enforcement of its ballot-access requirements effectively precluded him from obtaining access to the ballot and thereby imposed a severe and intolerable burden on his First Amendment rights.  United States District Judge Terrence Berg of this Court and the Sixth Circuit agreed and enjoined the State from strictly enforcing its signature requirements and filing deadlines against the candidate. *See Esshaki v. Whitmer*, --- F.Supp. 3d ---, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020) (Berg., J.), *aff'd in part and rev'd in part*, *Esshaki v. Whitmer*, --- F. App'x ---, 2020 WL 2185553 (6th Cir. May 5, 2020).

In this action, Plaintiff SawariMedia LLC, a civil-rights organization that seeks to place an initiative on Michigan's 2020 general election ballot, brings a claim that mirrors the one brought in *Esshaki*.  SawariMedia alleges Governor Whitmer's stay-at-home orders, together with strict enforcement of Michigan's signature requirement and filing deadline, impose a severe and impermissible burden on its First Amendment rights.  For the same reasons that Judge Berg and the Sixth Circuit barred strict enforcement of the ballot-access signature requirement and filing deadline against the plaintiff in *Esshaki*, this Court will enjoin strict enforcement of them against SawariMedia.  Accordingly, SawariMedia's motion for a preliminary injunction (*see* Mot., ECF No. 2) is **GRANTED** on the terms set forth below.

# I

The Michigan Constitution "reserve[s]" to "the people" the "power to propose laws and to enact and reject laws, called the initiative." Mich. Const., 1963, art. 2, § 9. In order to "invoke the initiative," a citizen must submit "petitions signed by a number of registered electors, not less than eight percent … of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected." *Id.*  A total of 4,250,585 votes were cast in Michigan's last general election for Governor.[1]  Thus, 340,047 signatures were required in order to secure a spot for an initiative proposal on Michigan's 2020 general election ballot.  Under Michigan law, the petitions containing those signatures had to be filed with the Michigan Secretary of State by not later than May 27, 2020. *See* Mich. Comp. Laws § 168.471 (requiring the filing of initiative petitions with the Secretary of State "at least 160 days before the election at which the proposed law would appear on the ballot").

Once signed petitions are filed with the Secretary of State, the Board of State Canvassers "shall canvass the petitions to ascertain if the petitions have been signed by the requisite number of qualified and registered [voters]." Mich. Comp. Laws § 168.476.  During this canvassing process, the Board of State Canvassers, among other things, reviews a "random sampl[e]" of signatures to determine if the signatures are valid. (Decl. of Defendant Jonathan Brater, Michigan Director of Elections, at ¶7, ECF

---

[1] *See* https://mielections.us/election/results/2018GEN_CENR.html.

No. 7-2, PageID.149-151.) "Every petition within the random sample is reviewed for facial validity," and valid signatures are then "checked against the Qualified Voter File [] to verify the signer's registration status." (*Id.*, PageID.150.) The canvassing process also allows interested parties to challenge a determination made about a signature's validity. (*See id.*) "It takes approximately 60 days to complete the random sampling and challenge process." (*Id.*, PageID. 151.) The Board of State Canvassers must complete their canvass and "shall make an official declaration of the sufficiency or insufficiency of an initiative petition no later than 100 days before the election at which the proposal is to be submitted." Mich. Comp. Laws § 168.477(1).

If the Board of State Canvassers declares that an initiative petition has sufficient signatures, the Michigan Legislature then has "40 session days" to either "enact[]" the proposal "without change or amendment" or reject the proposal. Mich. Const., 1963, art. 2, § 9. "If the Legislature does not enact the proposal within 40 session days, the Board of State Canvassers must prepare the proposal for the ballot by assigning a numerical ballot designation and approving ballot wording by no later than the 60th day prior to the election." (Brater Decl. at ¶11, ECF No. 7-2, PageID.151-152, citing Mich. Comp. Laws §§ 168.474a, 168.480.) Ballots are then prepared, printed, and mailed to military and overseas voters. *See* Mich. Comp. Laws §§ 168.759a, 168.714.

For the 2020 general election, the relevant dates are as follows:

| **DATE** | **ACTION** |
|---|---|
| May 27, 2020 | Petitions for initiatives that include at least 340,047 valid signatures must be filed with the Michigan Secretary of State |
| May 27, 2020 – July 23, 2020 | Board of State Canvassers canvass petitions |
| July 24, 2020 | Board of State Canvassers declares whether an initiative petition is sufficient or insufficient |
| September 4, 2020 | Board of State Canvassers must assign numerical designation and approve ballot wording for all statewide proposals |
| September 21, 2020 | Printed ballots must be made available for delivery to overseas and military voters |
| November 3, 2020 | General election |

## II

### A

SawariMedia "is a coalition of like-minded individuals who work together to educate and promote their political views in the public arena." (Decl. of Amani Sawari, owner and manager of SawariMedia, at ¶2, ECF No. 2, PageID.66.)  In the "summer of 2019," SawariMedia media began planning to place an initiative on Michigan's 2020 general election ballot pursuant to the process described above. (*Id.* at ¶4, PageID.66.) That initiative seeks "to allow all [Michigan] prisoners regardless of the date on which they were sentenced, the right to earn time off their sentences by incentivizing good behavior, academic and professional achievement." *See* http://mprca.info/petition.

SawariMedia has "hired campaign staff" and has been "diligently campaigning" in support of the initiative for nearly a year. (Sawari Decl. at ¶4, ECF No. 2, PageID.66.[2]) It has, among other things, "purchased a website devoted to the initiative, hosted several town-hall meetings [related to] the initiative, conducted multiple training sessions across the state for canvassers of the [initiative], and purchased more than thirty-four thousand (34,000) copies of the [initiative's ballot] petition." (*Id.*)  It has also "implemented a plan to collect the [required] number of signatures" so that the initiative qualifies to be placed on the November 2020 general election ballot. (*Id.* at ¶6, PageID.67.)  SawariMedia formally filed its ballot initiative petition with Defendant Michigan Secretary of State on January 16, 2020, and it began collecting signatures as of that date.

## B

By early March, SawariMedia appeared to be well on its way to collecting a sufficient number of signatures to place its initiative on the November 2020 general election ballot.  At that time, it had "collected approximately two-hundred fifteen thousand (215,000) valid signatures" in support of the initiative – an average of over

---

[2] Ms. Sawari's declaration in the record is unsigned.  During the June 5, 2020, hearing on Plaintiffs' motion, Ms. Sawari affirmed under oath that the statements in her declaration are true and accurate.

22,000 per week. (*Id.* at ¶¶ 3, 7, PageID.66-67.)  And it had nearly two and a half months to collect the remaining 125,000 signatures that it needed under Michigan law.  But then, the world changed.

On March 10, 2020, the Michigan Department of Health and Human Services identified the first two presumptive-positive cases of the COVID-19 coronavirus in Michigan.[3]  Governor Whitmer declared a "State of Emergency" that same day. The State of Emergency executive order recognized that COVID-19 "can easily spread from person to person" and could "result in serious illness or death."[4]  As the virus began to spread rapidly across the State (and country), this Court closed to the public.  Sports leagues stopped holding games.  Churches, synagogues, and mosques stopped holding in-person services.  And the federal government issued a series of recommended guidelines to "slow the spread" of the virus.  Large gatherings of people stopped taking place, and citizens were urged not to leave their homes and not to allow others (even family) to visit their homes.

At this same time, Governor Whitmer began issuing a series of executive orders to require "social distancing" and mitigate the spread of the virus in Michigan.  These executive orders included:

---

[3] *See* Gov. Whitmer Executive Order 2020-04, Declaration of State of Emergency, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521576--,00.html.
[4] *Id.*

- A March 13, 2020, executive order that prohibited the assembly of more than 250 people in a shared space and closed all K-12 school buildings in the state.[5] This order provided that it did not "abridge protections guaranteed by the state or federal constitution under these emergency circumstances" (the "Constitutional Exemption Language").

- A March 16, 2020, executive order that closed various places of public accommodation, such as restaurants, bars, and gyms.[6] This order did not include the Constitutional Exemption Language.

- A March 19, 2020, executive order that prohibited the assembly of more than 50 people in a shared space.[7] This order did include the Constitutional Exemption Language.

On March 23, 2020, Governor Whitmer issued what has become known as the "Stay-at-Home Order."[8] The Stay-at-Home Order, subject to very limited exceptions, required "all individuals currently living within the State of Michigan … to stay at home or at their place of residence. Subject to the same exceptions, all public and private

---

[5] *See* Gov. Whitmer Executive Order 2020-5, Temporary Prohibition on Large Assemblages and Events, Temporary School Closures, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521595--,00.html.

[6] *See* Gov. Whitmer Executive Order 2020-9, Temporary Restrictions on the Use of Places of Public Accommodation, https://www.michigan.gov/whitmer/0,9309,7A-387-90499_90705-521789--,00.html.

[7] *See* Gov. Whitmer Executive Order 2020-11, Temporary Prohibition on Large Assemblages and Events, Temporary School Closures, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521890--,00.html.

[8] *See* Gov. Whitmer Executive Order 2020-21, Temporary Requirement to Suspend Activities That Are Not Necessary to Sustain or Protect Life, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html.

gatherings of any number of people occurring among persons not part of a single household [were also] prohibited."[9]   The Stay-at-Home Order further prohibited all persons and entities from "operat[ing] a business or conduct[ing] operations that require workers to leave their homes or places of residence except to the extent that those workers are necessary to sustain or protect life or to conduct minimum basic operations."[10]   It also required all persons to remain at least six feet apart. Importantly, and unlike the executive orders issued on March 13 and March 19, the Stay-at-Home Order did not include the Constitutional Exemption Language.     On April 9, April 24, and May 1, 2020, Governor Whitmer issued additional executive orders extending the requirement that Michigan residents stay in their homes.[11]   None of those extensions included the Constitutional Exemption Language.

On May 7, May 18, and May 21, Governor Whitmer again issued executive orders extending the stay-at-home provisions.[12]   While these orders still required Michiganders to remain at home, each of the extensions did include the Constitutional Exemption Language.[13]   The May 21 extension of the Stay-at-Home Order kept in place

---

[9] *Id.*

[10] *Id.*

[11] *See* Gov. Whitmer Executive Orders 2020-42, 2020-59, and 2020-70.

[12] *See* Gov. Whitmer Executive Orders 2020-77, 2020-92, and 2020-96.

[13] The April 9, April 24, May 1, May 7, May 18, and May 21 executive orders extending the stay-at-home requirement each contained some limited modifications to the initial Stay-at-Home Order.   Aside from the inclusion of the Constitutional

the requirement that Michigan residents stay at home through and beyond May 27, 2020 – the filing deadline for initiative petitions.

Each of Governor Whitmer's executive orders provided that "[c]onsistent with [Mich. Comp. Laws §] 10.33 and [Mich. Comp. Laws §] 30.405(3), a willful violation of this order is a misdemeanor."[14]

## C

Beginning in early-to-mid March, in order to comply with Governor Whitmer's executive orders, SawariMedia "postponed many of [its] efforts to collect signatures" in support of its ballot initiative. (Sawari Decl. at ¶10, ECF No. 2, PageID.67.)  Unable to collect signatures in person, SawariMedia attempted to collect signatures by mailing petitions to potentially interested signers.  But that effort cost "a substantial amount of money" and was hampered by lengthy delays in the processing of mail in Michigan. (*Id.* at ¶23, PageID.69.)  SawariMedia insists that Governor Whitmer's executive orders, and the enforcement of those orders, "made it impossible" to collect the required number of signatures by the May 27, 2020, filing deadline. (*Id.* at ¶20, PageID.69.)

## III

This action is brought by SawariMedia and Co-Plaintiffs Deborah Parker, Judy Kellogg, and Paul Ely against Governor Whitmer, Michigan Secretary of State Jocelyn

---

Exemption Language in the May 7, May 18, and May 21 executive orders, none of the other modifications are relevant to the Court's analysis.

[14] *See, e.g.*, Gov. Whitmer Executive Orders 2020-21, 2020-77, 2020-96.

Benson, and Michigan's Director of Elections Jonathan Brater.  Parker, Kellogg, and Ely are each Michigan citizens who say that they would have signed SawariMedia's ballot initiative petition but for Governor Whitmer's executive orders. (*See* Declarations, ECF No. 2, PageID.71-76.)  In addition, Parker says that she "requested that a copy of the petition be mailed to [her]" so that she could sign the petition and return it to SawariMedia, but she has "yet to receive it in the mail." (Parker Decl. at ¶8, ECF No. 2, PageID.72.)

Plaintiffs' Complaint contains three counts.  In Counts I and II, Plaintiffs allege that Defendants' strict enforcement of the May 27, 2020, filing deadline and the requirement that SawariMedia collect 340,047 signatures under the present circumstances violates their First and Fourteenth Amendment rights. (*See* Compl. at ¶¶ 49-60, ECF No. 1, PageID.10-11.)  In Count III, Plaintiffs claim that Defendants have violated Plaintiffs' Fourteenth Amendment rights by "refus[ing] to apply this Court's previous Order in *Esshaki v. Whitmer, et al.*" to SawariMedia's ballot initiative. (*Id.* at ¶¶ 61-65, PageID.12.)

 Plaintiffs have also filed a motion for a temporary restraining order and/or a preliminary injunction. (*See* Mot., ECF No. 2.)  In the motion, Plaintiffs ask the Court to enter an order prohibiting Defendants from enforcing the signature requirement and filing deadline for ballot initiative petitions. (*See id.*)

Plaintiffs mailed copies of their Complaint and motion to the Court on May 4, 2020.  However, due to a delay in docketing *pro se* filings in this Court due to reduced

in-person staffing during the COVID-19 pandemic, neither document was processed or posted to the Court's docket until May 20, 2020. (*See* Docket).  Once the Court became aware of this action and the emergency nature of Plaintiffs' motion, it immediately scheduled and held an on-the-record telephonic status conference with Plaintiffs and counsel for the Defendants, and it set an expedited briefing schedule on Plaintiffs' motion.  Defendants filed their response to the motion on May 27, 2020, Plaintiffs filed their reply on June 1, 2020, and Defendants filed a sur-reply. (*See* Def.s' Resp. Br., ECF No. 7; Pl.s' Reply Br., ECF No. 12; Def.s' Sur-reply, ECF No. 16.)  The Court held a hearing on the motion on June 5, 2020.

## IV

A preliminary injunction "is an extraordinary and drastic remedy." *S. Glazer's Distribs. of Ohio v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)).  Although the movant "is not required to prove his case in full at a preliminary injunction hearing," *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007), a preliminary injunction should not "be granted lightly." *S. Glazer's*, 860 F.3d at 849.

A district court balances four factors when considering a motion for a preliminary injunction or a temporary restraining order: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause

substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Id.* (quotations omitted).  The last two factors "merge when the Government is the opposing party.'" *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"[T]hese are factors to be balanced, not prerequisites to be met." *Id.*  "[N]o one factor is controlling." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).  "When evaluating these factors for an alleged constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Thompson v. DeWine*, --- F.3d ---, 2020 WL 2702483, at *2 (6th Cir. May 26, 2020) (internal quotation marks omitted).  *See also Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (recognizing that in First Amendment cases, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of succeed on the merits").

## V

The Court begins with the first factor of the preliminary injunction analysis: whether Plaintiffs have shown a substantial likelihood of success on the merits of their claims.  The Court concludes that they have.

## A

"[A]lthough the Constitution does not require a state to create an initiative procedure, if it creates such a procedure, the state cannot place restrictions on its use that violate the federal Constitution[.]" *Thompson*, 2020 WL 2702483, at *2.  Sixth Circuit precedent "dictates" that this Court review Plaintiffs' First Amendment challenges to Michigan's signature requirement and filing deadline for ballot initiatives

13

"under the *Anderson-Burdick* framework."[15]  *Id.*  Analysis under that framework involves several steps:

> First, we determine the burden the State's regulation imposes on the plaintiffs' First Amendment rights. When States impose "reasonable nondiscriminatory restrictions[,]" courts apply rational basis review and "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547, (1983)). But when States impose severe restrictions, such as exclusion or virtual exclusion from the ballot, strict scrutiny applies. *Id.* at 434, 112 S.Ct. 2059; *Schmitt* [*v. LaRose*], 933 F.3d [628,] 639 [6th Cir. 2019] ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot."). For cases between these extremes, we weigh the burden imposed by the State's regulation against " 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' " *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 (quoting *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564).

*Id.* at ** 2-3 (emphasis added).  *See also Esshaki*, 2020 WL 1910154, at *4 (describing the applicable *Anderson-Burdick* framework).

## B

### 1

The Court begins its analysis under *Anderson-Burdick* by determining the severity of the burden that Defendants have placed upon Plaintiffs' First Amendment

---

[15] *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

rights.  In two very recent cases, another Judge on this Court (Judge Berg) and the Sixth Circuit evaluated the First Amendment burdens imposed by the combination of a state's enforcement of ballot-access provisions and a Governor's stay-at-home orders issued during the COVID-19 pandemic.

The first of those cases is *Esshaki*, *supra*.  The plaintiff in that case, Eric Esshaki, was a candidate for the United States Congress in Michigan's Eleventh Congressional District. *See Esshaki*, 2020 WL 1910154, at *2.  Under Michigan law, Esshaki needed to collect 1,000 valid signatures by April 21, 2020, in order to qualify for the August 4, 2020, primary ballot. *See id.*  At the time Governor Whitmer issued the Stay-at-Home order on March 23, 2020, Esshaki had collected approximately 700 signatures. According to Esshaki, Governor Whitmer's Stay-at-Home Order "for all practical purposes denied [him] the opportunity to collect the [remaining] signatures that [he] needed during the timeframe between March 23 and April 21." *Id.*  Esshaki then filed suit against Governor Whitmer, Director Brater, and Secretary Benson.  He claimed that enforcement of the signature requirement and filing deadline "under the present circumstances" and "without exception for consideration or consideration of the COVID-19 pandemic or [Governor Whitmer's] Stay-at-Home Orders" violated his First Amendment rights. *Esshaki*, 2020 WL 2185553, at *1.

Judge Berg analyzed Esshaki's claim under the *Anderson-Burdick* framework and determined that the combination of the State's ballot access laws and the Stay-at-Home Order placed a severe burden on Esshaki's constitutional rights.  Judge Berg

explained that the State "pulled the rug out from under" Esshaki and other candidates

who needed to circulate petitions while the Stay-at-Home order was in place:

> The reality on the ground for Plaintiff and other candidates is that state action has pulled the rug out from under their ability to collect signatures. Since March 23, 2020, traditional door-to-door signature collecting has become a misdemeanor offense; malls, churches and schools and other public venues where signatures might be gathered have been shuttered, and even the ability to rely on the mail to gather signatures is uncertain—if not prohibitively expensive. Absent relief, Plaintiff's lack of a viable, alternative means to procure the signatures he needs means that he faces virtual exclusion from the ballot. After considering Defendants' arguments, this Court has little trouble concluding that the unprecedented—though understandably necessary— restrictions imposed on daily life by the Stay-at-Home Order, when combined with the ballot access requirements of Sections 168.133 and 168.544f, have created a severe burden on Plaintiff's exercise of his free speech and free association rights under the First Amendment, as well as his due process and equal protection rights under the Fourteenth Amendment—as expressed in his effort to place his name on the ballot for elective office. *See Libertarian Party of Ky.* [*v. Grimes*], 835 F.3d [570, 574 (6th Cir. 2016)] ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot."). Accordingly, a strict scrutiny analysis is appropriate here. *See, e.g.*, *Faulkner v. Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (applying strict scrutiny to candidate's ballot access claim in light of state's COVID-19 restrictions).

*Esshaki*, 2020 WL 1910154, at *6.

On appeal, the Sixth Circuit held that Judge Berg had "properly applied the

*Anderson-Burdick* test" and had "correctly determined that the combination of the

State's strict enforcement of the ballot-initiative provisions and the Stay-at-Home

Orders imposed a severe burden on the plaintiff's ballot access, so strict scrutiny applied." *Esshaki*, 2020 WL 2185553, at *1.

The second case is *Thompson*, *supra*. In *Thompson*, "three individuals and two organizations" were "obtaining signatures in support of initiatives to amend the Ohio Constitution." *Thompson*, 2020 WL 2702483, at *1. "While Plaintiffs were advancing their petitions for the November 3, 2020 general election, the world was stunned by the advent of [the COVID-19 pandemic]." *Thompson*, 2020 WL 2557064, at *1 (S.D. Ohio May 19, 2020). "In an effort to respond rapidly to this threat, Ohio Governor Mike DeWine, in Executive Order 2020-01D, authorized Ohio Department of Health Director Amy Acton, M.D., to formulate general treatment guidelines to curtail the spread of COVID-19 in Ohio. In accordance with Governor DeWine's Executive Order, Dr. Acton issued several Director's Orders, one of which required all individuals living in Ohio to stay home beginning March 22, 2020 subject to certain exceptions." *Id.*

The plaintiffs in *Thompson* then filed suit against Governor DeWine and others. The plaintiffs claimed that "Ohio's strict enforcement of its requirements for placing local initiatives and constitutional amendments on the ballot unconstitutionally burden[ed their] First Amendment rights in light of the ongoing pandemic and Ohio's emergency orders." *Id.* at *2. The district court reviewed the plaintiffs' claims under the *Anderson-Burdick* framework and, for the same reasons as in *Esshaki*, it found that the combination of Ohio's strict application of its ballot-access requirements and Ohio's

17

stay-at-home orders imposed a severe burden on the plaintiffs' constitutional rights. *See id.* at ** 12-14.

The Sixth Circuit reversed.  It held that the burden on the plaintiffs was not severe for two primary reasons.  First, the Sixth Circuit found it "vitally important" that Ohio's stay-at-home orders included significant "express exemption[s]" for First Amendment activity. *Thompson*, 2020 WL 2702483, at *3.  More specifically, "[f]rom the first Department of Health Order issued on March 12, Ohio made clear that its stay-at-home order did not apply to 'gatherings for the purpose of the expression of First Amendment protected speech.'  And in its April 30 order, [Ohio] declared that its stay-at-home restrictions did not apply to 'petition or referendum circulators.'" *Id.* (internal citation omitted).  Second, "Ohio [began] to lift their stay-at home restrictions" prior to the relevant filing deadline. *Id.* at *4.  The plaintiffs in *Thompson* had a "five-week period from Ohio's rescinding of its [stay-at-home] order until the deadline to submit an initiative petition." *Id.*  Based largely on these factors, the Sixth Circuit held in *Thompson* that the burden on plaintiffs was only "intermediate" and was not "severe." *Id.* at ** 4-5.

## 2

In assessing the impact of the burden on Plaintiffs' First Amendment rights, the question that the Court must now resolve is: is the burden more like the burden in *Esshaki* (severe) or more like *Thompson* (intermediate)?  The burden is more like *Esshaki* and is therefore severe.

Like the plaintiff in *Esshaki*, the Plaintiffs here faced a daunting signature requirement with a firm deadline in the midst of the COVID-19 pandemic. And from March 23, 2020, through May 7, 2020, the Plaintiffs in this action were subject to the exact same Stay-at-Home Order (and the extensions of that order) as the plaintiff in *Esshaki* – an order that prohibited Michiganders from leaving their homes except in very limited circumstances. Then, from May 7 through May 27, 2020 (the petition submission deadline), the Plaintiffs here were subject to three additional executive orders that continued to require Michigan residents to stay in their homes and avoid all public and private gatherings except as expressly authorized. Just as in *Esshaki*, the State "pulled the rug out from under the ability [of Plaintiffs] to collect signatures" and "[a]bsent relief, [Plaintiffs'] lack of a viable, alternative means to procure the signatures [they] need[] means that [they] face virtual exclusion from the ballot." *Esshaki*, 2020 WL 1910154, at *6. Thus, as in *Esshaki*, this burden on Plaintiffs' First Amendment rights is severe.

The burden is unlike *Thompson* for two primary reasons. First, and most importantly, in *Thompson*, "*none* of Ohio's pandemic response regulations changed the status quo on the activities Plaintiffs could engage in to procure signatures for their petition." *Thompson*, 2020 WL 2702483, at *3 (emphasis added). As the Sixth Circuit emphasized, and as described above, Ohio's stay-at-home orders included two provisions that clearly allowed the plaintiffs to circulate their petitions. The first provision "made clear that its stay-at-home order did not apply to 'gatherings for the

purpose of the expression of First Amendment protected speech.'" *Thompson*, 2020 WL 2702483, at \*3. The second exemption "declared that its stay-at-home restrictions did not apply to 'petition or referendum circulators.'" *Id.* These "express exemptions" were "vitally important" to the Sixth Circuit's determination that Ohio's stay-at-home orders did not impose a severe burden on the plaintiffs' First Amendment rights. *Id.*

In sharp contrast here, Governor Whitmer's initial Stay-at-Home Order and the April 9, April 24, and May 1, 2020, extensions of that order – which covered the six-week period from March 23, 2020, through May 7, 2020 – did not include any language exempting any constitutionally protected activity, much less language specifically exempting petition circulating.[16] And while the May 7, May 18, and May 21 executive

---

[16] Defendants stress that even though the Stay-at-Home Order, and the April 9, April 24, and May 1 extensions of that order, did not expressly exempt constitutionally protected activities, the orders were "interpreted" to allow for those activities. (Def.s' Resp., ECF No. 7, PageID.114-115.) This "interpretation" was found on the State of Michigan's website in a "frequently asked questions" document. (*See id.*) But as the Sixth Circuit highlighted in *Thompson*, while "executive officials in Michigan *informally indicated* [in the FAQ's] that they would not enforce [the Stay-at-Home Order and the extensions of that order] against those engaged in protected activity …. that promise is not the same thing as putting the restriction in the order itself." *Thompson*, 2020 WL 2702483, at \*3 (emphasis added) (distinguishing the Ohio stay-at-home orders at issue in *Thompson* from the Michigan stay-at-home orders at issue in *Esshaki*). *See also Fair and Equal Michigan*, Mich. Ct. Claims Case No. 20-000095, at 10-11 (June 6, 2020) (noting that the State's frequently-asked-questions document "did not have the force of law" and, notwithstanding that document, individuals who gathered for the purpose of expressing their political views during the pendency of the Stay-at-Home Order were "in jeopardy of arrest"). Moreover, two of Governor Whitmer's previous orders – *i.e.*, the executive orders issued on March 13, 2020, and March 19, 2020 (described above) – did include language purporting to exempt constitutionally protected activity, but that language was omitted from the Stay-at-Home Order and the April 9, April 24, and May 1

orders extending the Stay-at-Home Order did include the Constitutional Exemption Language, it is far from clear that that language permitted citizens to gather petition signatures. The Constitutional Exemption Language provided that the restrictions imposed by the Governor did not "abridge protections guaranteed by the state or federal constitution *under these emergency circumstances*."[17] But that begs the difficult question: how do "these emergency circumstances" impact constitutional protections? Do citizens have a First Amendment right to gather signatures in public at the height of a raging COVID-19 pandemic that threatens the health and, indeed, the lives of millions of Americans?[18] Notably, the exemptions from the stay-at-home order in *Thompson* raised no such questions. On the contrary, the Sixth Circuit found them to be "clear." *Thompson*, 2020 WL 2702483, at *3. For these reasons, the Constitutional Exemption Language – which was present only in the orders covering the last twenty days of the signature-collection period – did not meaningfully lessen the burden on Plaintiffs' First

---

extensions of that order. Under these circumstances, it would be unreasonable to interpret the Stay-at-Home Order, and the April 9, April 24, and May 1 extensions of that order, as purporting to exempt constitutionally protected activity.

[17] *See*, *e.g.*, Gov. Whitmer Executive Order 2020-77, *supra* (emphasis added).

[18] There are no obvious answers to the questions posed above. But there is at least some authority for the proposition that liberties that citizens enjoy under the Constitution may be subject to at least some otherwise impermissible restraints during a public health crisis. *See, e.g., Jacobson v. Massachusetts*, 197 US 11 (1905); *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 925 (6th Cir. 2020) (recognizing that during a public health emergency it may be appropriate to apply a "state-friendly standard of review" to a governmental restraint on liberty taken to combat the emergency even though "in normal times there is no way" that the restraint would "pass constitutional muster").

Amendment rights in the same manner or to the same extent as the exemptions in *Thompson*.

Second, this case is unlike *Thompson* because in *Thompson*, Ohio's stay-at-home order was "rescinded" before the relevant filing deadline and the plaintiffs had five full weeks to finish gathering their required signatures. *Id.* at *4. During that five-week period, both the plaintiff signature-gatherers *and* the citizens the plaintiffs wished to solicit were free to leave their homes and to appear in public places. Here, in contrast, Governor Whitmer's executive orders requiring Michiganders to stay at home remained in place up through the May 27 deadline for the submission of petitions. The lifespan of those orders supports the conclusion that, in combination with strict enforcement of the signature requirement and filing deadline, they imposed a severe burden on Plaintiffs' First Amendment rights. *See id.* (explaining that the Sixth Circuit had "found a severe burden in *Esshaki* because Michigan's stay-at-home order remained in effect through the deadline to submit ballot-access petitions").[19]

---

[19] The executive orders in effect for the last twenty days of the collection period – between May 7 and May 27 – contained the Constitutional Exemption Language, but for the reasons explained above, that language did not meaningfully limit the extent of the burden imposed on Plaintiffs' First Amendment rights. But even if that language did somehow lessen the burden, that reduction lasted only twenty days and did not render non-severe the overall burden on Plaintiffs' First Amendment rights caused by all of the Governor Whitmer's executive orders.

**3**

Defendants raise several arguments in support of their position that the burden here is not severe.  None persuade the Court that the burden on Plaintiffs' First Amendment rights is less than severe.

**a**

Defendants first argue that the burden is not severe because notwithstanding Governor Whitmer's Stay-at-Home order, Plaintiffs had plenty of time to collect the required number of signatures before the May 27, 2020, filing deadline. (*See* Def.s' Reply Br., ECF No. 7, PageID.127-128.)  Defendants say that Plaintiffs could have begun circulating their petitions on November 29, 2019, but "Plaintiffs decided late to start circulating their petitions" and did not start collecting signatures until January 16, 2020. (*Id.*)  Defendants insist that Plaintiffs are responsible for that delay and the resulting inability to collect the required number of signatures. (*See id.*)  The Court disagrees.

Judge Berg rejected a similar argument in *Esshaki*, and the argument fares no better here.  Plaintiffs have shown diligence collecting their signatures.  Plaintiffs collected over sixty percent of the required number of signatures – an average of over 22,000 signatures per week – during a cold Michigan winter and were easily on pace to collect the required 340,047 signatures before the May 27 deadline.  Indeed, as Judge Berg recognized in *Esshaki*, "warmer spring weather [that] would accommodate outdoor activities [would] be more conducive to large social gatherings and door-to-

23

door canvassing." *Esshaki*, 2020 WL 1910154, at *4.  As in *Esshaki*, "[i]t is not enough to merely assert that [plaintiffs'] successful collection of [sixty] percent of the requisite signatures with [more than two months] left to go is somehow evidence of dilatory behavior." *Id.*

<strong>b</strong>

Next, Defendants assert that the burden is not severe because Plaintiffs could have collected signatures and circulated petitions in the thirteen days between Governor Whitmer's State of Emergency executive order on March 10, 2020, and the issuance of the Stay-at-Home Order on March 23.  Defendants insist that during that time, the State "by no means required or even suggested that Plaintiffs must suspend their signature collection efforts immediately or indefinitely." (Def.s' Resp., ECF No. 7, PageID.128-129.)

But that argument "both defies good sense and flies in the face of all other guidance that the State was offering to citizens at that time." *Esshaki*, 2020 WL 1910154, at *5.  As the Court recognized in *Esshaki*, at the time Governor Whitmer issued her State of Emergency executive order, the State was urging citizens to "reduce in person gatherings" and limit their interactions with "vulnerable population." *Id.* "Instead of 'doubling down' on door-to-door signature collection efforts between March 10th and March 23rd – increasing the risk that Plaintiff[s] and [their] supporters could possibly be exposed to the COVID-19 virus by engaging in repeated close-contact with potential petition signers or unknowingly transmit[ting] it to others – prudence at

24

that time counseled in favor of doing just the opposite." *Id.*   Plaintiffs should be commended for putting the public health of Michiganders above their own self-interest and desire to collect the required number of signatures, not denigrated for making that conscientious choice. *See also Fair Maps Nevada v. Cegavske*, 2020 WL 2798018, at *13 (D. Nev. May 29, 2020) ("The Court does not find the fact Plaintiffs stopped collecting signatures in early March—after the COVID-19 outbreak started in Nevada, but before the Stay at Home Order went into effect—weighs against finding diligence here. Forcing circulators to go out to collect signatures during the COVID-19 pandemic is unreasonable and unwise.").

### c

Defendants next argue that the burden placed upon Plaintiffs is not severe because "Plaintiffs [] had the ability to continue collecting signatures by switching to the use of regular mail." (Def.'s Resp., ECF No. 7, PageID.130.)  Defendants suggest that Plaintiffs could have paid to mail petitions to registered voters and then included a paid "self-addressed stamped envelope" so that voters could mail the signed petition back to Plaintiffs. (*Id.*)  This argument was properly rejected in *Esshaki*:

> Further, the unforeseen nature of such an expense here surely magnifies its burden: no candidate, at the time they initially declared for office, could have anticipated that at the end of March, just when in-person signature collecting might be expected to be ramping up, there would arise the sudden need to switch to a mail-only signature campaign. While Plaintiff is not entitled to free access to the ballot, the financial burden imposed by an unforeseen but suddenly required mail-only signature campaign is far more than an

25

incidental campaign expense or reasonable regulatory requirement. For any candidate other than those with unusually robust financial means, such a last-minute requirement could be prohibitive. *Compare Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016) ("the incidental costs of gathering signatures on petitions do not come close to exclusion from the ballot, and thus do not impose a severe burden on ballot access") *with Lubin*, 415 U.S. at 718, 94 S.Ct. 1315 (holding that a $701.60 filing fee is an unconstitutional burden on indigent candidate with no alternative mechanism to get his name on the ballot).

Furthermore, though the Court finds that a mail-only campaign for the remaining signatures would impose more than an incidental cost on Plaintiff and candidates like him, in the context of the COVID-19 pandemic, the efficacy of a mail-based campaign is unproven and questionable at best. Conducting an effective mail campaign in the current environment presents a significant hurdle. Such a mail-only signature gathering campaign assumes both a fully operational postal service and a public willing to walk to the mailbox, open physical envelopes, sign a petition, and deposit the envelope back into a mailbox or make a trip to the Post Office. Today, sadly, ample reasons exist to question the plausibility of each of those assumptions. For one, the United States Postal Service has itself been affected by the COVID-19 virus: As of April 7, 2020, more than 386 postal workers have tested positive for the virus nationwide and mail delays have been confirmed in Southeast Michigan. Media reports extensively discuss the risks of contracting COVID-19 from mail, suggesting, at least anecdotally, that the issue may be of widespread public concern or even fear. Getting voters to return signatures by mail in normal times is difficult. In these unprecedented circumstances, the efficacy of a mail-only signature gathering campaign is simply an unknown. Forcing candidates—through little fault of their own—to rely on the mails as their only means of obtaining signatures presents a formidable obstacle of unknown dimension.

*Esshaki*, 2020 WL 1910154, at *5.

There is evidence in this record – through the declarations of Sawari and Parker – that Plaintiffs attempted to send petitions through the mail, but due to delays at the postal service, that attempt was not successful. (*See* Sawari Decl. at ¶23, ECF No 2, PageID.69; Parker Decl. at ¶8, ECF No. 2, PageID.72.)  The Court is not persuaded that the potential availability of an expensive – and uncertain – mailing campaign lessened the burden on Plaintiffs here.

### d

Finally, Defendants argue that it was the COVID-19 pandemic, not any actions taken by Governor Whitmer or the other Defendants, that caused Plaintiffs to fall short of the signature requirement by the filing deadline.  While the pandemic undoubtedly did play some role in preventing Plaintiffs from gathering the required amount of signatures, the root cause of Plaintiffs' inability to collect signatures was Governor Whitmer's executive orders that required Michigan residents to remain in their homes for more than two months.   Indeed, as Judge Berg aptly concluded in *Esshaki*, it was "*state action*" that "pulled the rug out from under the[] ability to collect signatures." *Esshaki*, 2020 WL 1910154, at *6 (emphasis added).  And the Sixth Circuit affirmed that determination. *See Esshaki*, 2020 WL 2185553, at *1. *See also Fair and Equal Michigan v. Benson*, Mich. Ct. Claims Case No. 20-000095, at 11 (June 6, 2020) (rejecting argument in action by different ballot-initiative petitioners challenging the

same filing deadline and signature requirement at issue here that "it was not the state action that burdened the plaintiff's ability to seek signatures but the pandemic itself").

Thus, for all of the reasons stated above, the Court concludes that Michigan's signature requirement and filing deadline for ballot initiative petitions, in combination with Governor Whitmer's Stay-at-Home Order, severely burdened Plaintiffs' constitutional right to the ballot.

## C

The next question the Court must answer is: under the current circumstances and as applied to Plaintiffs, are Michigan's signature requirement and filing deadline for initiative petitions "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. The Court concludes that they are not.

The Court acknowledges that the signature requirement and filing deadline may serve compelling interests, including ensuring the integrity of the electoral process and ensuring that initiatives have a modicum of public support before appearing on the ballot. But as in *Esshaki*, the signature requirement and filing deadline are not "narrowly tailored to the context of the COVID-19 pandemic – as [they] would need to be to survive a strict scrutiny analysis." *Esshaki*, 2020 WL 1910154, at *7.

First, maintaining the current petition filing deadline is not essential to ensure the integrity of the election process under these circumstances. While modifying the filing deadline would reduce the time to canvass Plaintiffs' petitions and resolve challenges, present the initiative to the Michigan Legislature, and prepare ballots for

the November general election, as set forth in detail in the footnote below, there would still be sufficient time to complete those important tasks even with an extension.[20]  The Court is not persuaded that modifying the filing deadline would prevent the State from completing its work before ballots need to be printed in late September. *See Fair Maps Nevada,* 2020 WL 2798018, at \*16 (holding that ballot-access deadline was not narrowly tailored in context of the COVID-19 pandemic and Nevada's stay-at-home order and rejecting argument that extending time to collect signatures would prevent

---

[20] Under normal circumstances, the State would have 117 days between the May 27, 2020, filing deadline for ballot initiative petitions and the September 21, 2020, deadline to complete all of its pre-election tasks and print and mail general election ballots to overseas voters.  As of the date of this Opinion and Order, there are 103 days between now and September 21.  Even if some of that remaining time is allocated to Plaintiffs to collect signatures, it seems that the State would have enough time to complete its tasks.  In fact, it appears that each step in the process could reasonably be shortened.  For instance, the Michigan Legislature ordinarily has 40 "session days" to consider a ballot proposal, but, when motivated, it has passed bills in far less time. *See* http://legislature.mi.gov/doc.aspx?2020-SB-0858 (tracking bill that Legislature took up and passed within 14 days during pandemic).  Moreover, it seems reasonable to conclude that the Board of State Canvassers could complete its work and resolve all challenges in less than the ordinarily-allotted amount of time that is currently provided for that work.  Indeed, in an ordinary election cycle, the Board must complete its work within that time even if a large number of petitions are filed.  And Defendants have not identified any evidence that the Board faces a heavy docket of petitions for review this cycle.  There is simply no evidence in this record that the Board could not complete its work with respect to Plaintiffs' one initiative petition in a much shorter time period if necessary.  Finally, the Board could immediately begin its review of the 215,000 signatures that SawariMedia has already collected – while SawariMedia seeks to collect the remaining 125,000 signatures – thereby reducing any possibility that it would run out of time to review signatures that SawariMedia gathers at a later date.

defendants from "not hav[ing] enough time to properly do their job …. There does appear to be enough time to do everything [d]efendants would normally do on an expedited timeline").

Next, the State may achieve its interest in ensuring that a ballot initiative has a sufficient modicum of support without adhering to the signature threshold currently in effect.  As Judge Berg explained in *Esshaki*:

> [E]ven assuming the State has a compelling interest in the need to ensure a modicum of support through the enforcement of the signature requirement, the regulatory means to accomplish that compelling interest are not narrowly tailored to the context of the COVID-19 pandemic—as it would need to be to survive a strict scrutiny analysis. This is because under typical conditions, Plaintiff's ability to obtain one thousand signatures from registered voters would be a valid indication that he has earned the "modicum of support" the Michigan Legislature deemed sufficient to appear on the ballot. When setting the requirement at one thousand signatures, the Michigan Legislature intended that candidates be allowed until April 21, 2020—under normal, non-pandemic conditions—to gather one thousand signatures using all of the traditionally effective means to do so. The March 23, 2020 Stay-at-Home Order, for reasons already discussed, effectively halted signature-gathering by traditional means, reducing the available time prescribed by the Michigan Legislature to gather one thousand signatures by twenty-nine days. Thus, a state action narrowly tailored to accomplish the same compelling state interest would correspondingly reduce the signature requirement to account for the lost twenty-nine days. Or, to state it differently, even assuming the State generally has a compelling interest in ensuring candidates have a modicum of support before allowing inclusion on the ballot, here the State has not shown it has a compelling interest in enforcing *the specific numerical requirements* set

> forth in Section 168.544f in the context of the pandemic
> conditions and the upcoming August primary.

*Esshaki*, 2020 WL 1910154, at *7 (emphasis in original).  For similar reasons, the

State's compelling interest in assuring that a ballot initiative has a sufficient modicum

of support could be achieved by requiring a still-substantial number of signatures that

is less than the 340,047 that would be required under normal circumstances absent a

global pandemic.  Indeed, there is nothing inherent in the 340,047 signatures threshold

that establishes that an initiative has a modicum of public support only if it has that

many signatures.  Nor is it obvious that an initiative that collects less than that amount,

but still collects hundreds of thousands of signatures in a shorter period of time, lacks a

modicum of public support.

Because Defendants have not shown that their enforcement of the signature

requirement and filing deadline are narrowly tailored to the present circumstances,

those requirements cannot survive a strict scrutiny analysis as applied to Plaintiffs.[21]

*See also Esshaki*, 2020 WL 2185553, at *1 (affirming Judge Berg's holding that both

the signature requirement and filing deadline for candidate petitions were "not narrowly

---

[21] In *Fair and Equal Michigan*, *supra*, the Michigan Court of Claims held that
Michigan's filing deadline and signature requirement for ballot initiatives *are*
narrowly tailored under the present circumstances.  While the Court agrees with
much of the Court of  Claims' other analysis in that case (as evidenced by this
Court's repeated citation to other aspects of that court's ruling), the Court
respectfully disagrees with that court's conclusion that the ballot-access regulations
here are narrowly tailored under these circumstances.

tailored *to the present circumstances*" (emphasis in original)).  Plaintiffs have therefore established a likelihood of success on the merits of their constitutional claims.

**D**

Before the Court addresses the remaining preliminary injunction factors, the Court must address one additional argument Defendants have made.  Defendants argue that Plaintiffs are not entitled to relief under the doctrine of laches because Plaintiffs "unreasonably delayed raising their claims before this Court." (Def.s' Resp., ECF No. 7, PageID.121.)  The Court disagrees.

The Court acknowledges that Plaintiffs did not mail their Complaint or emergency motion to the Court until May 4, 2020, and thus, even if there was not an unanticipated delay in the action reaching this Court's docket, that left only three weeks before the May 27, 2020, filing deadline to resolve this action.  And the Court agrees that had Plaintiffs filed their action earlier, it would have left more time to fashion a potential remedy.  But the Court disagrees with Defendants that this delay was "unreasonable" or is a reason to deny Plaintiffs relief. (*Id.*, PageID.122.)

Plaintiffs, who were each acting *pro se* at the time this action was initially filed, did not act unreasonably.  They complied with Governor Whitmer's executive orders, including the Stay-at-Home Order, even though doing so came at the cost of finishing their circulation of the petitions; they contacted the Secretary of State's Office on multiple occasions to inquire whether the signature requirement and/or filing deadline would be changed in light of the Governor's executive orders; and they closely

monitored the *Esshaki* litigation, and not unreasonably believed that when Defendants agreed to make substantial alterations to the filing deadline and signature requirement for candidate in that case, that the Defendants would do the same for ballot initiatives. (*See* Sawari Decl. at ¶¶ 16-18, ECF No. 2, PageID.68.)   And once it became clear that Defendants were not going to make such accommodations for ballot petitions, Plaintiffs then filed this action.   Moreover, a not insubstantial part of the delay – the delay from May 4, 2020, until May 20, 2020, when the case first appeared on the Court's docket – was due to delays in the Court's processing of mail due to the pandemic.   Had this Court been operating under normal operating conditions, the Court almost certainly would have resolved Plaintiffs' motion before the May 27 filing deadline.   The Plaintiffs did not unreasonably delay filing this action – and, at a minimum, did not delay so unreasonably as to warrant denial of relief. *See also Fair and Equal Michigan*, Mich. Ct. Claims Case No. 20-000095, at 7-8 (rejecting argument that claims recently brought by proponents of a different ballot initiative against the same ballot-access deadline at issue here were barred by the doctrine of laches because "the action [was] not the sort of last-minute, potentially election-delaying lawsuit that courts have declined to address" based on laches).

## VI

The Court now turns to the remaining preliminary injunction factors.   The Court concludes that, on balance, these factors also favor preliminary injunctive relief.

First, Plaintiffs have shown that they will suffer irreparable harm in the absence of injunctive relief.  Without action from this Court, Plaintiffs' initiative will not appear on the 2020 general election ballot, and there is no after-the-fact remedy for that exclusion.  Moreover, in "[b]allot access cases such as this … irreparable harm can be presumed." *Esshaki*, 2020 WL 1910154, at *8. *See also Liberation Party of Ohio v. Husted*, 751 F.3d 403, 412 (2014) ("[I]t is well-settled that loss of First Amendment freedoms … unquestionably constitutes irreparable injury." (quotation omitted)).

The Court next considers whether an injunction would cause substantial harm to others and whether the public interest would be served by an injunction.  As noted above, these two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  Defendants insist that an injunction would harm its interest in "effectuating statutes enacted by representatives of its people." (Def.s' Reps., ECF No. 7, PageID.138; quoting *Maryland v. King*, 133 S.Ct. 1, at *3 (2012) (Roberts, C.J. in chambers).)  Thus, as in *Esshaki*, this Court must "weigh the State's proffered harm of not being able to enforce its ballot access requirements against the harm to the Plaintiff[s] and the public harms that would result from the lack of any injunction." *Esshaki*, 2020 WL 1910154, at *9.  Judge Berg concluded in *Esshaki* that the balance "weigh[ed] in favor of an injunction," and this Court agrees:

> First, in the absence of an injunction, Plaintiff and other candidates in his position were left with no choice but to have violated the Stay-at-Home Order in order to collect the signatures they need. [….] The broader public interest is not served by preserving the current signature-gathering scheme

at the cost of encouraging more candidates and their supporters to risk their health and criminal penalties to gather signatures.

Second, while Defendants accurately point out that voters do not have an "absolute right to vote for a candidate of [their] choice," it is also the case that a candidate's ability to appear on the ballot "affects the First Amendment rights of voters." [*Libertarian Party of Ohio v.*] *Blackwell*, 462 F.3d [579,] 588 [6th Cir. 2006]; *see also Ill. State Bd. of Elections [v. Socialist Workers Party*], 440 U.S. [ 184, 99 S.Ct. 983 ("By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences."). Here, if a candidate should fail to obtain enough signatures because she had relied on the somewhat standard and eminently reasonable assumption that she would be able to ramp up signature collecting in the spring, Michigan voters may lose the ability to vote for a candidate who, absent the pandemic, would have easily been included on the ballot. This would cause injury to the First Amendment rights of an innumerable number of Michigan voters.

*Esshaki*, 2020 WL 1910154, at *9. Just as in *Esshaki*, "[t]he broader public interest [would] not [be] served by preserving the current signature-gathering scheme" which would have forced "supporters [of ballot initiatives] to risk their health and criminal penalties to gather signatures." *Id.* Moreover, absent relief, Michigan voters would "lose the ability" to vote for a ballot initiative that, "absent the pandemic, would have [likely] been included on the ballot." *Id.* For all of these reasons, the harm to the public and the Plaintiffs outweighs the State's legitimate interest in enforcing its election laws in the manner and timeframe established prior to the COVID-19 pandemic. These factors therefore also favor an injunction.

## VII

Finally, the Court must consider whether to require Plaintiffs to post a bond. Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." However, notwithstanding that provision, "the rule in [the Sixth] [C]ircuit has long been that the district court possesses discretion over whether to require the posting of security." *Motan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). *See also Concerned Pastors for Social Action v. Khouri*, 220 F. Supp. 3d 823, 829 (E.D. Mich. 2016) (same). And courts have "significant discretion to waive the bond requirement in light of the public interest." *Khouri*, 220 F. Supp. 3d at 829.

The Defendants have not asked that Plaintiffs be required to post a bond, and the Court concludes that given the substantial public interests at issue here, a bond would not be appropriate. Thus, Plaintiffs are not required to post a bond.

## VIII

For all of the reasons stated above, the strict application of Michigan's signature requirement and filing deadline for ballot initiatives is unconstitutional as applied here, and Plaintiffs' motion for a preliminary injunction (ECF No. 2) is therefore **GRANTED**. Defendants are enjoined from excluding Plaintiffs' ballot initiative from the 2020 general election ballot on the basis that Plaintiffs did not collect 340,047 valid signatures by the May 27, 2020, filing deadline.

The Court will not "dictate to [Defendants] preciously how they should conduct their elections." *Esshaki*, 2020 WL 2185553, at *2. Instead, as in *Esshaki*, the Court "instruct[s Defendants] to select [their] own adjustments so as to reduce the burden on ballot access, narrow the restrictions to align with [their] interest, and thereby render the application of the [signature requirement and filing deadline] constitutional under the circumstances."[22] *Id.*

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 11, 2020

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 11, 2020, by electronic means and/or ordinary mail.

s/ Holly A. Monda
Case Manager
(810) 341-9764

---

[22] To be crystal clear: the Court is not compelling the Defendants to take any particular action in order to remedy the constitutional violation found by the Court. If, for instance, Defendants believe that they could not alter the requirement under the Michigan Constitution concerning the minimum number of signatures in support of a ballot initiative, they could extend the statutory deadline for the filing of the petitions containing those signatures. Once again, how to remedy the constitutional violation is up to the Defendants in the first instance.